UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| LISA SCHERFF, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:16-CV-658 |
| | § | |
| SOUTH TEXAS COLLEGE, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING IN PART AND DENYING IN PART SOUTH TEXAS COLLEGE'S MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

I.  **Factual and Procedural Background**

Now before the Court are the Motions to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by (1) Defendant South Texas College ("STC") (Dkt. No. 16); and (2) Defendants Shirley A. Reed, individually and in her official capacity as STC President, Nora Martinez, individually and in her official capacity as STC Professor, Edmundo Garcia, individually and in his official capacity as STC Professor, Christie M. Candelaria, individually and in her official capacity as STC Program Chair, Elizabeth Delgado, individually and in her official capacity as STC Counselor, and Krystal Saenz, individually and in her official capacity as STC Tutoring Center Manager (Dkt. No. 17).  Plaintiff Lisa Scherff, a nursing student at STC, filed this suit against STC, the named individual Defendants, and "DOES I-XX, inclusive," alleging that Defendants took various retaliatory actions against her after she "rose up as a spokesperson" to complain about a nursing program course.  (Dkt. Nos. 1, 6 at ¶ 3).  Plaintiff alleges that she was "so traumatized by STC's various retaliatory attacks that she suffered a debilitating panic and anxiety episode and was forced to take a week of medical leave," and that

after she returned to school, Defendants further retaliated against her by "failing to even assess [Plaintiff's] medically documented accommodation needs." *Id.* at ¶¶ 6, 7.

Plaintiff's First Amended Complaint, her live pleading,[1] asserts the following causes of action: (1) against STC for violations of Section 504 of the Rehabilitation Act ("RA"), violations of the Americans with Disabilities Act ("ADA"), breach of contract, and negligent hiring, training, and supervision; (2) against all Defendants, under 42 U.S.C. § 1983, for violations of Plaintiff's rights to free speech under the First Amendment to the U.S. Constitution, and to substantive due process and equal protection under the Fourteenth Amendment; and (3) against the individual Defendants for intentional infliction of emotional distress. (Dkt. No. 6 at ¶¶ 55-137). Through the instant Motions, STC and the individual Defendants move for dismissal of all of these causes of action for failure to a state a claim upon which relief can be granted. (Dkt. Nos. 16, 17). Upon consideration of the Motions and the parties' responsive briefing (Dkt. Nos. 24-27), in light of the relevant law, the Court finds that both Motions must be granted in part and denied in part, leaving pending Plaintiff's RA and ADA claims against STC for failure to accommodate her alleged disability, as well as Plaintiff's individual capacity causes of action against Defendants Martinez, Garcia, Candelaria, Delgado, and Saenz for First Amendment retaliation.

## II.     Standard of Review

A party may move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) is read in conjunction with the pleading standard set forth in Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P.

---

[1]  Plaintiff filed suit in this Court on November 17, 2016 and amended her complaint as of right on January 23, 2017, prior to service on any Defendant. (Dkt. Nos. 1, 6); *see* FED. R. CIV. P. 15(a). STC and the individual Defendants executed waivers of service on January 26, 2017. (Dkt. Nos. 7-13).

8(a)(2); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-68 (2009). This standard does not require detailed factual allegations. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However, a party's "obligation to provide the 'grounds' of his 'entitle[ment]' to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). To survive a Rule 12(b)(6) motion, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the pleaded factual content allows the court, drawing upon its "judicial experience and common sense," to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* at 678 (citing *Twombly*, 550 U.S. at 556), 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

## III.  Overview of Plaintiff's Pleaded Allegations

### A.  Plaintiff Speaks Out on Problems with "RSNG 2331" Nursing Course

Plaintiff's First Amended Complaint alleges the following facts underlying her causes of action against Defendants. Plaintiff matriculated at STC in 2013 and was on track to complete her Associate Degree in Nursing ("ADN") in the spring of 2016. (Dkt. No. 6 at ¶ 22). She was a student in good standing who maintained a 3.19 grade point average and earned success in all of her courses, except for "RSNG 2331." *Id.* at ¶ 23. Along with nearly 90 of the 136 students enrolled in the course, Plaintiff consistently failed the course exams, "in large part due to the haphazard teaching methods of the instructor." *Id.* at ¶ 24. "The problems in the content formulation and content delivery of RSNG 2331 were extensive and included impermissible

student access to test banks, noncompliance with the terms of the syllabus, and instructor inadequacy." *Id.* at ¶ 25.

After filing individual grade grievances to no avail, several students organized, and STC's vice-president called, an ADN student conference with the college ombudsman to occur on March 31, 2016. *Id.* at ¶ 26. Prior to that date, "ADN agents preemptively moved to squelch student participation at the scheduled meeting." *Id.* at ¶ 27. For example, Defendant Garcia instructed student Amanda de la Cruz, "Don't go to the meeting, don't speak, don't sign anything or you will be a target." *Id.* Despite the warnings, the meeting was attended by over 100 people, including Plaintiff. *Id.* at ¶¶ 28, 30. One student had already written a letter to the Texas Board of Nursing and Texas Education Association "explaining the improprieties of the RSNG 2331 exam," but feared reprisal if she read the letter aloud at the meeting. *Id.* at ¶ 29. Plaintiff, however, "was idealistically undaunted by the threats and rose up as a spokesperson, reading the letter and a list of complaints at the meeting and eventually giving interviews to local news stations about the program's problems." *Id.* at ¶ 30.

**B.  Defendants' Response**

In response, STC agreed to form a committee to investigate the students' concerns. *Id.* at ¶ 31. However, "[w]ithin days of emerging as a strong critical voice of the RSNG 2331 exam inequities, [Plaintiff] began to recognize she was indeed the target of extreme retaliation by the STC Nursing faculty." *Id.* at ¶ 32.

**1.  Defendant Garcia Requires Plaintiff to Perform Additional Clinical Assessment, Then Fails Her**

On April 2, 2016, Plaintiff and several other students met with their instructor, Defendant Garcia, in a break room during their clinical rounds at the Knapp Medical clinical site. *Id.* at ¶ 33. The students were inquiring about testing on-site, and Garcia lamented that their "speaking

up" would only "'make it harder for level 3 and would eventually close the school.'" *Id.* Garcia then "oddly hugged [Plaintiff] while looking at her in the eyes, an act that [Plaintiff] construed as both unwanted and threatening, and said sarcastically, 'But it's going to be okay.'" *Id.* at ¶ 34.

After completing her 6:30 a.m.-1:30 p.m. clinical rotation, Plaintiff was discussing post-graduation jobs with other nurses when Garcia approached the group, brusquely interrupted her conversation, and demanded that she perform a clinical assessment. *Id.* at ¶ 35. Although she had already fulfilled her assessment requirements for the term, Plaintiff complied and excelled at the task. *Id.* at ¶ 36. In fact, Garcia acknowledged her successful completion of the additional assessment by stating, "good, better than last time." *Id.* No other students were required to perform physical assessments twice, and at least one student never had to perform one at all. *Id.*

Upon Plaintiff's completion of the additional assessment, Garcia promptly told her that she had failed because she was wearing a wedding band with a small stone and "arguably non-compliant earrings." *Id.* at ¶ 37. "Meanwhile, there are countless examples of Garcia overlooking other students' minor dress code violations or, at the least, failing them at the start of the day instead of waiting until after dismissal to charge wardrobe violations." *Id.*

## 2.    Plaintiff Files Grievance and Speaks with Defendant Candelaria

In response to the incident with Defendant Garcia, Plaintiff filed a grievance and spoke with the program director, Defendant Candelaria. *Id.* at ¶ 38. Candelaria "lamented to her that the students' grade complaints were problematic, that several staff wanted to quit, and [that] the situation was a mess." *Id.* Candelaria admitted that Garcia should not have told Plaintiff that the grade complaints "would eventually close the school," and advised Plaintiff "to seek medical care for her upset mood." *Id.*

**3.      Defendants Garcia, Martinez, and Saenz File Complaints against Plaintiff**

Within a month of Plaintiff's "speaking up" and her grievance, Garcia and his colleague, Defendant Martinez, filed three separate, baseless complaints against Plaintiff with the Office of Conflict Resolution.  *Id.* at ¶ 39.  Garcia and Martinez alleged that Plaintiff was confrontational towards them on three occasions despite evidence, recordings, and witnesses disputing their version of the encounters.  *Id.*

The retaliation continued when Defendant Saenz, manager of the STC Tutoring Center, filed a false cheating complaint against Plaintiff.  *Id.* at ¶ 40.  Saenz also encouraged her employee to file a complaint alleging that Plaintiff was confrontational against him despite witnesses (including STC's own witnesses) indicating otherwise.  *Id.*

**4.      Effect on Plaintiff**

"Although investigations failed to back up STC allegations" against Plaintiff, the incidents affected Plaintiff's mental health, and "her willingness to continue to represent her peers in the ongoing RSNG 2331 grade dispute was certainly obliterated."  *Id.* at ¶ 41.  The failed assessment negatively affected Plaintiff's grades, and the three conduct complaints had the potential to place multiple disciplinary notations on Plaintiff's record.  *Id.* at ¶ 42.  It was not until "much later" that Garcia removed the failed assessment grade as a result of Plaintiff's complaint to Candelaria, "leaving [Plaintiff] to have increased anxiety and panic over the failing grade in the meantime."  *Id.*  Plaintiff "was so traumatized by STC's retaliatory attacks that she suffered a debilitating panic and anxiety episode and was forced to take a week of medical leave" in April 2016.  *Id.* at ¶ 43; *see also* ¶ 54.

**C.      Plaintiff Submits Request for Remediation and Testing Accommodations to Candelaria**

"Following her breakdown, [Plaintiff] again contacted Defendant Candelaria in accordance with STC medical leave and disability requirements to obtain remediation and appropriate testing accommodations for her disability." *Id.* at ¶ 44. Plaintiff gathered the appropriate medical paperwork to document her needs for remediation for the missed week of school, and for "extended testing accommodations and time" due to her medical condition. *Id.* at ¶ 45. She then emailed the documentation to Candelaria, requesting appropriate accommodations. *Id.* Plaintiff was not told, at any point, to provide documentation other than her doctor's note and clearance. *Id.*

**D.      Response to Plaintiff's Request**

Candelaria directed Plaintiff to her instructor, who then sent Plaintiff to the counselor, Defendant Delgado. *Id.* Instead of assessing Plaintiff's medically documented needs in order to determine appropriate accommodations, Delgado "simply allowed the instructor, Dr. Acevedo, to sit [Plaintiff] at a computer in Delgado's office to take the tests she missed due to her illness, without any accommodations or even shutting the door to drown outside noises." *Id.* at ¶ 46. "This is particularly negligent considering the fact that Delgado knew [Plaintiff's] history and needs as she had tested in Delgado's office previously." *Id.*

Delgado did not administer the exam; rather, the instructor administered the exam himself, absent any modifications. *Id.* at ¶ 47. Plaintiff was not given extra time, a separate proctor, or any other accommodations requested by her medical paperwork, nor did Delgado attempt to investigate the need for such accommodations. *Id.*

"What is more troubling about [Plaintiff's] experience with student services is that [she]

has a record with STC's ADA office." *Id.* at ¶ 49. "Prior accommodations were easily granted through the same student services lab without problems before [Plaintiff] became STC's target." *Id.*

At the semester's end, Plaintiff reached out to Delgado and was told that "the department did not recognize her request for disability services but instead only remembered a 'general request from the nursing faculty,' which the office did not even note in [Plaintiff's] files." *Id.* at ¶ 50. "On a formal technicality, STC ignored her request this time then told her what the process for formalizing the request *would have been* months later." *Id.* (emphasis in original).

**E.      Response to Plaintiff's Grievances**

Plaintiff apparently filed a second grievance, and alleges that STC dismissed both of her grievances and cleared its "agents" of all wrongdoing. *See id.* at ¶¶ 51-53. In doing so, STC ignored its own policies, regulations, and contracts by failing to apply the academic or disciplinary investigation process to Plaintiff's complaints. *Id.* at ¶ 51. Despite the mandate that an "HR designee" obtain convincing evidence, HR failed to contact Plaintiff and most of her witnesses, and ignored signed affidavits, video recordings, and witnesses available to corroborate Plaintiff's allegations. *Id.* at ¶ 53. Although Plaintiff requested both an investigation and "some relief in the form of protection from faculty," no protection was ever granted. *Id.* at ¶ 52.

**F.      Overall Effect on Plaintiff**

"Because of this extreme mistreatment, [Plaintiff] is terrified to return to finish her program at STC and with a D on her record, she is unable to transfer to a different school." *Id.* at ¶ 54. "Her anxiety and depression stemming from the retaliation attacks and the abrupt end of her impending career [are] debilitating; she has had to be medicated and meet repeatedly with doctors and biweekly with counselors following her medical breakdown" in April 2016. *Id.*

**IV.  Defendants' Motions to Dismiss**

**A.  Causes of Action against STC Only**

**1.  RA and ADA Violations**

**a.  Overview of Applicable Law, Plaintiff's Pleaded Allegations, and STC's Grounds for Dismissal**

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States...shall, solely by reason of her...disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a).  Similarly, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Both statutes prohibit discrimination against "qualified individuals with disabilities," with two notable distinctions: (1) the RA does so in the context of federally-funded programs or activities, whereas the ADA applies to public entities; and (2) the RA is triggered by discrimination "solely" by reason of disability, whereas the ADA applies even if discrimination on the basis of disability is not the sole reason for the exclusion or denial of benefits.  *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).  Implementing regulations and case law direct that discrimination under either statute includes the failure to make reasonable accommodations or modifications for students with disabilities.  *See* 34 C.F.R. § 104.44(a); 28 C.F.R. § 35.130(b)(7)(i); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750 (2017) (in educational context, noting that § 35.130(b)(7)(i) "requires a public entity to make 'reasonable modifications' to its 'policies, practices, and procedures' when necessary to avoid...discrimination," and that "[i]n a similar vein, courts have interpreted § 504

as demanding certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities"); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 990 (5th Cir. 2014) (recognizing cause of action under § 504 where school district refuses to provide reasonable accommodations for plaintiff to receive full benefits of school program, and equating liability standards under § 504 and ADA). The ADA and regulations implementing the RA also protect students from retaliation for engaging in protected activity under either statute. *See* 42 U.S.C. § 12203; 20 C.F.R. § 1614.101(b); *Ariel B. ex rel. Deborah B. v. Fort Bend Indep. Sch. Dist.*, 428 F. Supp. 2d 640, 665-66 (S.D. Tex. 2006). "Both statutes authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages." *Fry*, 137 S. Ct. at 750 (citing 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133). Cases interpreting either statute are instructive as to both. *Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trustees*, 855 F.3d 681, 690 (5th Cir. 2017) (citing *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)).

With respect to her RA claim, Plaintiff's First Amended Complaint alleges that she is a qualified individual with a disability, that STC receives federal financial assistance within the meaning of the statute, and that STC violated the RA by "failing to provide appropriate and necessary accommodations and modifications to [Plaintiff], so that she could continue in her educational program," and by "retaliating against [Plaintiff] when she began to advocate for [her] rights" under the statute. (Dkt. No. 6 at ¶¶ 56-60). With respect to her ADA claim, Plaintiff alleges that she is a qualified individual with a disability, that STC is a public entity within the meaning of the statute, and that STC violated the ADA by failing and refusing to reasonably accommodate Plaintiff, and to reasonably modify its services to Plaintiff. (Dkt. No. 6 at ¶¶ 66-70). Plaintiff further alleges that STC caused her to be "harassed and retaliated against, and

withdrawn from the [nursing] program," in violation of the ADA. *Id.* at ¶ 71. In sum, it appears that Plaintiff asserts two theories of recovery under each statute: failure to accommodate and retaliation.

STC's Motion first addresses Plaintiff's ADA claim, and moves to dismiss this claim on the grounds that Plaintiff's allegations fail to establish that she is a "qualified individual with a disability" within the meaning of the statute. (Dkt. No. 16 at ¶¶ 3, 4).[2] With respect to Plaintiff's RA claim, STC contends that dismissal is appropriate because Plaintiff has not alleged that she was discriminated against "solely by reason of" her disability. *Id.* at ¶ 5. STC's reply also takes the position that it could not have retaliated against Plaintiff by reason of her disability because she alleges that her anxiety and depression stemmed *from* the retaliatory measures taken against her. (Dkt. No. 26 at ¶¶ 3, 4).

**b.  Plaintiff Has Stated a Plausible Claim That She is a Qualified Individual with a Disability**

Plaintiff's complaint does not specifically name her alleged disability; rather, she alleges that the retaliatory actions taken against her in response to her public complaints about RSNG 2331 left her so traumatized that she suffered "a debilitating panic and anxiety episode and was forced to take a week of medical leave." (Dkt. No. 6 at ¶¶ 6, 43). Plaintiff also refers to this episode as a "breakdown." *Id.* at ¶¶ 8, 44, 54. Plaintiff's allegations that she requested accommodations upon her return to school, and that STC allegedly violated the ADA by failing to provide reasonable accommodations, indicate that the panic and anxiety episode/breakdown constitutes the alleged disability. Thus, relying on *Burns v. Air Liquide Am., L.P.*, 515 F. Supp. 2d 748 (S.D. Tex. 2007), and cases cited therein, STC claims that Plaintiff's disability is not protected by the ADA because "temporary, short-term stress and anxiety…with no lasting, long-

---

[2] STC does not move to dismiss Plaintiff's RA claim on this basis.

term limitations on her ability to...conduct any daily activities…is not of sufficient duration or impact to constitute a disability under the ADA."  (Dkt. No. 16 at ¶ 3); *Burns*, 515 F. Supp. 2d at 758.  In response, Plaintiff points to her additional, pleaded allegations that "[h]er anxiety and depression stemming from the retaliation attacks and the abrupt end of her impending career [are] debilitating," to the extent that "she has to be medicated and meet repeatedly with doctors and biweekly with counselors following her medical breakdown[.]"  (Dkt. No. 6 at ¶ 54; Dkt. No. 24 at § B).  The Court also notes Plaintiff's allegations that STC failed to provide suitable remediation and testing accommodations when Plaintiff returned from medical leave, despite knowledge of Plaintiff's "history and needs" and her "record with STC's ADA office," and despite the fact that she had receive accommodations in the past.  (Dkt. No. 6 at ¶¶ 46, 49).  In light of these additional allegations, the Court rejects STC's characterization of Plaintiff's condition as merely temporary.  Moreover, *Burns* and the cases upon which it relies pre-date the passage of the ADA Amendments Act of 2008 ("ADAAA"), intended by Congress "to broaden the definition and coverage of the term 'disability.'" *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013).[3]  The ADAAA retained the ADA's three-category definition of "disability" as: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  *Compare* 42 U.S.C. § 12102(1) (effective January 1, 2009); 42 U.S.C. § 12102(2) (effective through December 31, 2008).  However, the amendments made significant changes with regard to how these categories are interpreted.  The statute now provides an extensive and non-exclusive list of what constitutes "major life activities" (among them "learning,"

---

[3] In fact, the strict definition of disability adopted by one of the cases referenced by *Burns*—a reference noted in STC's reply—was the intended target of the ADAAA.  *See* (Dkt. No. 26 at ¶ 4); *Burns*, 515 F. Supp. 2d at 756 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, (2002)); *Neely*, 735 F.3d at 245.

"concentrating," and "thinking"), recognizes an episodic condition as a disability "if it would substantially limit a major life activity when active," and directs courts to determine whether an impairment substantially limits a major life activity "without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(2)(A), (D), (E). Regulations interpreting the amendments instruct that although "not every impairment will constitute a disability within the meaning of this section," "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Further, "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." *Id.* § 1630.2(j)(1)(ix). The Court finds that Plaintiff's allegations of a panic and anxiety episode/breakdown, anxiety and depression requiring continued medical treatment, a "record with STC's ADA office," and a history of accommodations, at least render plausible the claim that she suffered from a disability within the meaning of the ADA during the relevant time period.

**c.       Plaintiff's Allegations of First Amendment Retaliation Do Not Foreclose RA Claim**

STC also argues that Plaintiff cannot maintain an RA claim for discrimination "solely by reason of" her disability since she has offered another basis for the retaliatory measures taken against her: her complaints about RSNG 2331. (Dkt. No. 16 at ¶ 5; Dkt. No. 26 at ¶ 6). However, the existence of a potential First Amendment retaliation claim does not require dismissal of Plaintiff's cause of action under the RA for failure to state a claim. As Plaintiff notes, under the Federal Rules her pleading "may state as many separate claims or defenses as [she] has, regardless of consistency." (Dkt. No. 24 at § C); Fed. R. Civ. P. 8(d)(3). The Rules allow her to plead in the alternative, and provide no basis for dismissal at this stage.

### d. Plaintiff Has Failed to Allege Facts to Support ADA and RA Claims Brought under Theory of Retaliation

The elements of a prima facie case for retaliation under the ADA and RA are: (1) protected activity; (2) an adverse action; and (3) a causal connection between the two. *Ariel B.*, 428 F. Supp. 2d at 665. STC's reply attacks the third element, taking the position that STC could not have retaliated against Plaintiff in violation of the ADA because she alleges that her anxiety and depression stemmed *from* the alleged retaliation against her. (Dkt. No. 26 at ¶¶ 3, 4).[4] Although the sections of Plaintiff's complaint setting forth her retaliation causes of action make the generalized allegations that STC caused her to be "retaliated against, and withdrawn from the [nursing] program" in violation of the ADA, and that it retaliated against her "when she began to advocate for her rights" under the RA, her factual allegations provide no plausible support for these claims. Plaintiff does not explain how she "advocated for her rights" under either statute, but assuming that she did so by requesting accommodations, or by grieving the denial of the same,[5] she does not identify any adverse action taken against her because of her accommodation request (other than the separately actionable denial of that request), or because of the grievance. Rather, all of the specified acts of retaliation pre-date Plaintiff's panic and anxiety episode, request for accommodations upon her return from medical leave, and second grievance. The Court agrees with Defendants that Plaintiff has failed to plead facts to support an ADA or RA cause of action brought under the theory of retaliation.

### 2. Breach of Contract

### a. Overview of Plaintiff's Pleaded Allegations and STC's Grounds for Dismissal

---

[4] STC's reply does not specifically address Plaintiff's RA retaliation cause of action, but its argument applies equally to that claim.
[5] This is an assumption at best, given that Plaintiff does not specify the content of her second grievance.

In the section of her pleading setting forth her breach of contract cause of action against STC, Plaintiff alleges that she "has an express and implied contract with Defendant STC in connection with rights explicitly guaranteed by STC pursuant to STC's Nursing Handbook, Student Handbook, Employee Handbook, and the Student Code of Conduct." (Dkt. No. 6 at ¶ 75). Plaintiff further alleges that STC's actions, "including but not limited to [its] discrimination, denial of reasonable accommodations [and] physical and programmatic accessibility, harassment, retaliation, and the withdrawal from the program, each constitute a breach of the express and implied contract." *Id.* at ¶ 76. STC moves for dismissal of any such claim on the grounds that Plaintiff "has asserted no facts that specify any alleged contractual terms that were…agreed to by [both] parties, that were allegedly breached by [STC], or how [STC's] sovereign immunity was allegedly waived for a breach of contract claim." (Dkt. No. 16 at ¶ 9).

**b.    STC is Immune to Suit**

The elements of a cause of action for breach of contract under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.-Houston [14th Dist.] 2005, pet. denied)). STC's Motion attacks the first and third elements, but even assuming that Plaintiff's claim for breach of STC's nursing and student handbooks[6] and student code of conduct meets these elements, the Court finds that STC is immune to suit for any such claim.

The parties agree that STC, as a political subdivision of the State of Texas, enjoys

---

[6] Plaintiff has not explained how, as a student, she and STC agreed to any terms contained within STC's *employee* handbook, and in any event, her response concedes the "non-contractual nature of an employee handbook" under Texas law. (Dkt. No. 24 at § E).

governmental immunity to suit for breach of contract absent explicit statutory waiver of that immunity; the dispute between the parties concerns whether, as Plaintiff contends, the limited waiver set forth by Texas Local Government Code § 271.151 applies. *See* (Dkt. No. 6 at ¶ 15; Dkt. No. 18 at ¶ 15; Dkt. No. 16 at ¶¶ 11-13; Dkt. No. 24 at § E; Dkt. No. 26 at ¶ 8); *Tooke v. City of Mexia*, 197 S.W.3d 325, 330 n.11, 331-33 (Tex. 2006). Section 271.152 provides that "[a] local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter." TEX. LOC. GOV'T CODE § 271.152. The statue defines "contract subject to this subchapter," in relevant part, as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity[.]" *Id.* § 271.151(2)(A). Plaintiff's response points to "Texas state law jurisprudence explicitly hold[ing that] a 'school's catalog constitutes a written contract between the educational institution and the patron, where entrance is had under its terms,'" and claims that "[a]ccordingly, there was a written contract between STC and [Plaintiff], and STC should not prevail on a dismissal due to sovereign immunity." (Dkt. No. 24 at § E) (quoting *Univ. of Texas Health Sci. Ctr. at Houston v. Babb*, 646 S.W.2d 502, 506 (Tex. App.-Houston [1ˢᵗ Dist.] 1982, no writ)); *see also Burnett v. Coll. of the Mainland*, 994 F. Supp. 2d 823, 829 (S.D. Tex. 2014) (under *Babb*, defendant college's nursing program student handbook may have created binding contract under Texas law). However, even assuming that STC's equivalent of a school catalog created a written contract between the parties, Plaintiff has not explained how such a contract constitutes an agreement for the provision of goods or services to STC, so as to fall within the definition of a contract to which the statutory waiver of immunity

applies. Moreover, even if she had, the Court independently notes that the waiver set forth by §

271.152 "does not waive sovereign immunity to suit in federal court." TEX. LOCAL GOV'T CODE

§ 271.156. Plaintiff has failed to state a breach of contract claim for which relief can be granted,

and that claim must be dismissed.

### 3.     Negligent Hiring, Training, and Supervision

Plaintiff's complaint alleges that STC's liability for negligent hiring, training, and

supervision stems from the breach of its duties: (1) of reasonable care to its students, including

Plaintiff; (2) "not to hire individuals with a propensity towards committing unlawful acts against

those who lawfully go about their business"; (3) "to adequately train and supervise [its] agents,

officers, and employees"; and (4) to protect the public, including Plaintiff, "from the illegal

actions of its own agents, officers, employees and others." (Dkt. No. 6 at ¶¶ 86-91). STC's

Motion asserts its immunity to suit for these claims, and Plaintiff's response "concedes that STC

cannot be held liable for negligent hiring, training, and supervision because of its immunity."

(Dkt. No. 16 at ¶ 14; Dkt. No. 24 at § F). Therefore, the Court will dismiss these claims against

STC.[7]

### B.     Section 1983 Causes of Action against STC and Individual Defendants

### 1.     Overview of Applicable Law, Plaintiff's Pleaded Allegations, and Defendants' Grounds for Dismissal

Section 1983 provides a claim against any "person" who, "under color of any statute,

ordinance, regulation, custom, or usage, of any State," violates another's rights under the U.S.

Constitution. 42 U.S.C. § 1983; *e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). To

---

[7]  Plaintiff asks for leave to amend her complaint to substitute the individual Defendants for STC, but since the duties to adequately hire, train, and supervise employees are duties imposed by Texas law on the employer itself, the Court finds that any such amendment would be futile. (Dkt. No. 27 at ¶ 7); *see, e.g.*, *Garcia v. Allen*, 28 S.W.3d 587, 592 (Tex. App.-Corpus Christi 2000, pet. denied); *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (court may consider futility of amendment in determining whether to grant leave to amend).

state a § 1983 claim, "a plaintiff must (1) allege a violation of a right secured by the Constitution…and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley*, 726 F.3d at 638 (quoting *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008)). A plaintiff may bring a § 1983 claim against a person in his individual or official capacity, or against a local government entity. *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipalities and other local government units are "persons" subject to suit under § 1983). A § 1983 suit against a person in his official capacity is a suit against his office, and is no different from a suit against the entity itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Monell*, 436 U.S. at 690 n.55).

Plaintiff brings § 1983 claims against STC and the individual Defendants, sued in their individual and official capacities, for retaliation in violation of Plaintiff's First Amendment right to free speech, and for violations of Plaintiff's rights to substantive due process and equal protection under the Fourteenth Amendment. (Dkt. No. 6 at ¶¶ 93-137). The Motions filed by STC and the individual Defendants request dismissal of all of these claims on various, partially overlapping grounds, now consolidated for consideration herein. (Dkt. Nos. 16, 17). As to all claims, STC challenges Plaintiff's ability to demonstrate "municipal" liability. (Dkt. No. 16 at ¶¶ 1, 2). The individual Defendants seek dismissal of the official capacity claims against them as redundant of the claims against STC, make a generalized appeal to the defense of qualified immunity, and join STC in specifically challenging Plaintiff's allegations underlying her First Amendment retaliation, substantive due process, and equal protection claims. (Dkt. No. 16 at ¶¶ 8, 15; Dkt. No. 17 at ¶¶ 3-6; Dkt. No. 26 at ¶ 5; Dkt. No. 27 at ¶ 4). The individual Defendants also seek dismissal of Plaintiff's request for exemplary damages against them. (Dkt. No. 17 at ¶¶

13, 14).

## 2. Official Capacity Claims

The Court first addresses the individual Defendants' request for dismissal of Plaintiff's §
1983 claims brought against them in their official capacities. (Dkt. No. 17 at ¶ 5). Defendants
assert that these claims are redundant of the § 1983 claims against STC, and Plaintiff's response
concedes that the official capacity claims should be dismissed. *Id.*; (Dkt. No. 25 at § D).
Therefore, the Court will grant Defendants' request and consider the remaining arguments raised
by the Motions as they apply to the claims against STC and Defendants sued in their individual
capacities.

## 3. Individual Capacity Claims

## a. Qualified Immunity

The Court next turns to the individual Defendants' appeal to the defense of qualified
immunity, as all Defendants' more specific challenges to Plaintiff's First and Fourteenth
Amendment claims are subsumed in this analysis. The defense of qualified immunity "protects
government officials from civil damages liability [under § 1983] when their actions could
reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir.
2011) (en banc). A plaintiff seeking to overcome this defense must show that: (1) the official
violated a constitutional right; and (2) the right was "clearly established" at the time of the
challenged conduct. *Id.* at 371 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts
have discretion to decide which prong to address first. *Id.* With regard to the second prong, "a
defendant cannot be said to have violated a clearly established right unless the right's contours
were sufficiently definite that any reasonable official in the defendant's shoes would have
understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In

other words, existing precedent must have placed the…constitutional question confronted by the official beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741) (internal quotations omitted). For this reason, courts are cautioned "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (quoting *al-Kidd*, 563 U.S. at 742) (internal citation and quotations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

### b.    First Amendment Retaliation Claims

### i.    Defendants Not Entitled to Qualified Immunity on Grounds That Plaintiff Did Not Speak on Matter of Public Concern

The First Amendment, made applicable to the States through the Fourteenth Amendment, provides in relevant part that "Congress shall make no law…abridging the freedom of speech…or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I; *Meyer v. Grant*, 486 U.S. 414, 420 (1988). It encompasses "not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citing *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)). It is well-established that "for speech by a public *employee* to enjoy constitutional

protection from retaliation by a public employer, the speech must involve a matter of public concern." *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 221 (5th Cir. 1999) (quoting *Denton v. Morgan*, 136 F.3d 1038, 1042 (5th Cir.1998)) (emphasis added). Operating on the assumption that the "public concern" requirement extends to the context of public higher education,[8] Defendants' reply asserts that the "grade dispute speech" in which Plaintiff engaged "is not what has been contemplated as being a matter of public concern for First Amendment purposes." (Dkt. No. 26 at ¶ 4). As Defendants observe, "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'" *Id.*; *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983); *San Diego v. Roe*, 543 U.S. 77, 83-84 (2004)) (internal citations omitted). Whether speech is of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

Plaintiff's alleged speech consisted of reading aloud, at an ADN student conference with the college ombudsman, another student's letter to the Texas Board of Nursing and the Texas Education Association "explaining the improprieties of the RSNG 2331 exam," and giving

---

[8]  The parties do not address whether the requirement applies in this context, nor has the Fifth Circuit weighed in on this point. If a plaintiff's retaliation claim is not subject to the analysis for public employees, the claim must be evaluated under the test applicable to private citizens, which merely requires a showing that the plaintiff was engaged in constitutionally protected activity. *Culbertson v. Lykos*, 790 F.3d 608, 618 (5th Cir. 2015) (quoting *Keenan*, 290 F.3d at 258). "The First Amendment generally prevents government from proscribing speech…because of disapproval of the ideas expressed," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citing cases) (internal citations omitted), and in the public school setting, school officials' prohibition of a student's "expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969). The Court need not resolve, on Defendants' Motion, whether the public concern requirement applies in this case, since even if it does, Plaintiff's pleading sets forth facts sufficient to meet it.

interviews to local news media stations "about the program's problems." (Dkt. No. 6 at ¶¶ 26, 29-30). Plaintiff alleges that the conference was organized by students and called by the STC vice-president, and attended by over 100 people. *Id.* at ¶¶ 26, 28. Defendants make the conclusory argument that Plaintiff's speech "involving exam inequities and an ongoing RSNG 2331 grade dispute" falls outside the realm of public concern. (Dkt. No. 27 at ¶ 4). To the extent that Defendants are attempting to characterize Plaintiff's speech as merely personal, the Court notes that even speech containing "an element of personal interest" may still qualify as protected speech in the employment context. *Harris*, 168 F.3d at 222; *see also Gonzalez v. Benavides*, 774 F.2d 1295, 1300–01 (5th Cir. 1985) ("We do not read *Connick*…to exclude the possibility that an issue of private concern to the employee may also be an issue of public concern."). The Fifth Circuit found as much in *Harris*, a case involving two high school teachers who were reprimanded and transferred after they spoke at a committee meeting. *See Harris*, 168 F.3d at 221-23. The superintendent formed the committee to create an improvement plan for the school, appointed the teachers to the committee, and called the meeting to discuss implementation of the plan. *Id.* at 220. The Fifth Circuit reasoned that when the teachers reported to the committee that the principal was not following the plan, that her replacement was necessary to alleviate the problems, and that faculty would revolt if the superintendent did not do something, they "certainly had an interest in their speech as employees, because they could not help but benefit as teachers from the improvement of the educational environment" at the school. *Id.* at 221-22. "However, they also had strong interests as committee members in achieving the goals the committee set for itself and the school." *Id.* at 222. The court analogized to precedent holding "that an employee's testimony before a fact-finding or adjudicatory body is inherently a matter of public concern," and observed that "[b]y protecting the Plaintiffs' speech when the

administration requested them, as committee members, to speak truthfully on the school's progress, we are protecting 'the integrity of the truth seeking process.'" *Id.* at 222 (quoting *Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 886 (3d Cir. 1997)). No evidence existed that the teachers had a personal dispute or employment-related squabble with the principal, and since evidence did exist that concerns about the high school were the subject of widespread community debate, the Fifth Circuit concluded that the teachers' speech at the meeting involved a matter of public concern. *Id.* at 222-23.

Plaintiff in this case certainly had a personalized interest, as a student, in remedying the alleged improprieties of the RSNG 2331 exam (and more specifically, her grade), but it is also plausible that she had an interest, as a spokesperson at a nursing program meeting with the college ombudsman,[9] in contributing to the fact-finding process with the end-result of achieving change within the program, for the benefit of all affected students. That the letter she read aloud voiced complaints also transmitted to Texas Board of Nursing and the Texas Education Association, and that the local news in fact took interest in Plaintiff's complaints about the program, provide further indication that Plaintiff's speech touched upon a matter of public concern. *See Harris*, 168 F.3d at 222-23 (finding relevant to public concern analysis the fact that local newspaper ran story about low performance rating given school by Texas Department of Education); *Denton*, 136 F.3d at 1043 (letter to Texas Education Association reporting perceived wrongdoing on part of public officials clearly addressed matter of public concern). Assuming the public concern requirement applies to Plaintiff's retaliation claim, she has set forth facts supporting a plausible claim that her speech met that requirement. The Court also finds the cited case law sufficiently analogous to have placed Defendants on reasonable notice that Plaintiff's

---

[9] An ombudsman is generally defined as "[a] person appointed to investigate individuals' complaints against maladministration, especially that of public authorities." *See* https://premium.oxforddictionaries.com/us/definition/american_english/ombudsman?q=ombudsman.

alleged speech involved a matter of public concern. Therefore, Defendants may not appeal to the public concern requirement as a basis for qualified immunity.

ii.     **With Exception of Reed, Defendants Not Entitled to Qualified Immunity on Alleged Basis That They Were Not Final Decisionmakers**

Defendants' reply also appeals to the Fifth Circuit's observation, in the public employment context, that "only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983." (Dkt. No. 27 at ¶ 3); *Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) (citing *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 602-03, 605 (5th Cir. 2001)). Borrowing from STC's challenge to Plaintiff's purported showing of municipal liability, addressed more fully *infra*, Defendants point to case law directing that "[i]n a Texas community college, the board of trustees is the final decision maker." (Dkt. No. 27 at ¶ 3); *Richmond v. Coastal Bend Coll. Dist.*, 883 F. Supp. 2d 705, 712 (S.D. Tex. 2012) (citing *Dallas Cty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 872 (Tex. 2005)). Defendants therefore draw the conclusion that none of the individual Defendants may be held liable for First Amendment retaliation. (Dkt. No. 27 at ¶ 3). However, *Richmond* identified the board of trustees as the "final decision maker" in the context of municipal liability, without discussing the long-recognized distinction between final decisionmaking authority and final policymaking authority. *See* § B.4., *infra*. More precisely, state law establishes the board of trustees as STC's final policymaker whose actions may be attributed to STC itself, not the sole, final decisionmaker for purposes of individual liability. *See id.* The alleged retaliatory actions in this case, as discerned from Plaintiff's pleading, are: (1) the April 2, 2016 incident involving her professor, Garcia, who demanded that Plaintiff perform an additional clinical assessment and then failed her for minor dress code violations; (2) the three false complaints filed against Plaintiff by professors Garcia and Martinez, alleging that she was confrontational towards them;

(3) the false cheating complaint filed against Plaintiff by tutoring center manager Saenz; and (4) program chair Candelaria and counselor Delgado's failure to provide Plaintiff with reasonable accommodations after she returned to school from medical leave.  Assuming that these actions can form the basis for a First Amendment retaliation claim, that they were taken by individuals, and not the board of trustees, does not preclude liability.  Therefore, the Court will not dismiss Plaintiff's First Amendment claims against Garcia, Martinez, Saenz, Candelaria, and Delgado on the grounds asserted by Defendants.  However, with respect to the remaining Defendant, STC president Reed, Plaintiff makes *no* factual allegations indicating that this Defendant participated in, or made a final decision regarding, any action taken against Plaintiff in retaliation for her speech.  Therefore, at the very least, Reed is entitled to qualified immunity and Plaintiff's First Amendment retaliation claim against her must be dismissed.[10]

### c.  Substantive Due Process Claims

The due process clause of the Fourteenth Amendment, which prohibits any State from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. CONST. amend. XIV, § 1, "has been viewed as guaranteeing procedural due process and substantive due process," *John Corp. v. City of Houston*, 214 F.3d 573, 577 (5th Cir. 2000).  Plaintiff's complaint invokes only the substantive component, which bars certain government actions regardless of the fairness of the procedures used to implement them.  (Dkt. No. 6 at ¶¶ 113-19); *John Corp.*, 214 F.3d at 577 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  To establish either claim under § 1983, "a plaintiff must first identify a protected life, liberty or property interest and then

---

[10]  Defendants make no other challenge to Plaintiff's First Amendment claim, nor do they specify any other reason why they would be entitled to qualified immunity on this claim.  Although Defendants' Motion contains an alternative request that the Court require a Rule 7(a) reply to Defendants' qualified immunity defense, the Court will not order Plaintiff to provide a more specific reply to what is merely a generalized appeal.  *See* (Dkt. No. 17 at ¶¶ 6-9, 15-19); *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (court may require Rule 7(a) reply tailored to assertion of qualified immunity).

prove that governmental action resulted in a deprivation of that interest." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001)); *see also Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 344 (5th Cir. 2006). Through their Motion, Defendants move to dismiss Plaintiff's due process claim on the grounds that she has failed to identify a property or liberty interest infringed by Defendants. (Dkt. No. 17 at ¶ 3).

Citing to U.S. Supreme Court and Fifth Circuit precedent, Defendants offer the concession that "a student has a protectable constitutional interest in continued enrollment in a college program," but claim that "Plaintiff brings forth no allegations that she was expelled, prevented from taking courses or prevented from registering as a student at [STC] in a manner that would constitute a deprivation of a property or liberty interest[.]" *Id.* In fact, the cases cited in support of Defendants' concession merely assume, without deciding, the existence of a property or liberty interest protected by due process. *See Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 91-92 (1978) (even assuming that courts can review academic dismissals from public educational institutions under substantive due process standard, no showing of arbitrariness or capriciousness); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222-23 (1985) (even if university student's "assumed property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of record disclose no such action"); *Wheeler v. Miller*, 168 F.3d 241, 247 (5th Cir. 1999) (without identifying whether constitutionally protected interest exists, proceeding to analyze graduate student's substantive due process challenge to his dismissal under *Ewing*); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) (in addressing dental resident's procedural due process claim, finding that "[l]ike the Supreme Court in [*Horowitz, supra*], we need not decide what type of interest Davis had in the GPR [general practice residency] program, because even 'assuming the

existence of a liberty or property interest,' Davis received all the process he was entitled to under the Fourteenth Amendment") (quoting *Horowitz*, 435 U.S. at 84-85). Moreover, all of these cases concerned outright dismissals, not the alleged arbitrary and capricious actions identified by Plaintiff's response: (1) "extreme mistreatment" to the point that Plaintiff was "terrified to return to finish her program"; and (2) inability to transfer to a different school because of a "D" on her record. (Dkt. No. 6 at ¶ 54; Dkt. No. 25 at ¶ B). Under Defendants' cited precedent, any reasonable official in Defendants' shoes would not have known that these actions deprived Plaintiff of a constitutionally protected interest in her continued enrollment at STC or, in the case of the "D" on her record, at another school.

Plaintiff's response appeals to *Goss v. Lopez*, 419 U.S. 565 (1975), for the proposition that "students have a protected property interest in a state-provided public education." (Dkt. No. 25 at ¶ B). However, *Goss* identified that right in the public high school context, upon consideration of Ohio statutory provisions requiring the State to provide a free education and compelling students to attend. *Goss*, 419 U.S. at 573. The Supreme Court reasoned that "[h]aving chosen to extend the right to an education to people of [the plaintiffs'] class generally, Ohio may not withdraw that right on grounds of misconduct absent, fundamentally fair procedures to determine whether the misconduct has occurred." *Id.* at 574. Plaintiff's asserted right does not enjoy the same statutory underpinnings, nor does she allege that Defendants deprived her of the procedural due process protections discussed in *Goss*. *See id.* at 577-84. Moreover, the "withdrawal" of the right in *Goss* consisted of the plaintiffs' temporary suspensions from school, which the Court equated with "total exclusion from the educational process," at least for a period of time. *Id.* at 576. Plaintiff has alleged no more than a constructive exclusion from the educational process at STC (in the case of Defendants' alleged

"extreme mistreatment," preventing her from returning to school), or at another school (in the case of the "D" on her record, preventing her transfer); *Goss* would not have placed Defendants on reasonable notice that any such exclusion violated Plaintiff's right to substantive due process.

Plaintiff further appeals to *Goss*'s observation that "[t]he Due Process Clause also forbids arbitrary deprivations of liberty," and that "'[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied."  (Dkt. No. 25 at ¶ B); *id.* at 574 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)). Again, the minimal requirements discussed by *Goss* were those afforded by procedural due process, to students suspended based on charges of misconduct.  *Goss* reasoned that "[i]f sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment," and that "the claimed right of the State to determine unilaterally and without process whether that misconduct occurred immediately collides with the requirements of the Constitution." *Id.* at 575.  Plaintiff asserts that certain Defendants' filing of multiple false complaints against her—three complaints charging that she was confrontational towards them and one complaint alleging cheating—constituted a deprivation of her liberty, but she has not alleged that any Defendant deprived her of the requisite procedural protections.  *See Ayers v. Bd. of Regents Univ. of Texas Sys.*, 557 F. App'x 263, 271 (5th Cir. 2014), *abrogated on other grounds by Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307 (5th Cir. 2014) (in public employment context, "stigma" due process claim invokes procedural, as opposed to substantive, safeguards of due process clause); *In re Selcraig*, 705 F.2d 789, 796-97 (5th Cir. 1983) (employee could not claim that act of publishing information about him constituted denial of substantive

due process, since "the fourteenth amendment provides only procedural protection against injury inflicted by state officers to the interest state employees have in their reputation"). Moreover, the Fifth Circuit has found "mere allegations of cheating, without proof that the allegations led [the defendant] to take actions altering [the plaintiff's] status as a student," insufficient to trigger the plaintiff's procedural due process right to a hearing on those charges. *Wheeler*, 168 F.3d at 249. Plaintiff has alleged only that the complaints made against in her, in apparent retaliation for her speech at the ADN student conference and to the media, constituted such "extreme mistreatment" that she was "terrified" to return to school. In other words, Plaintiff has alleged no more than that the complaints resulted in the constructive alternation of her status as a student, and do not bring her "stigma" due process claim within the boundaries of clearly established law. For all of these reasons, the Court concludes that Defendants are entitled to qualified immunity on Plaintiff's substantive due process claims against them.

**d.     Equal Protection Claims**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. CONST. amend. XIV, § 1). The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiff's complaint invokes such a claim, supporting it with allegations that she was intentionally "retaliated against, harassed, disciplined against, and intimidated all against her will, and differently than those similarly situated STC

nursing students," by reason of "personal animus" and without rational basis. (Dkt. No. 6 at ¶¶ 121-22, 126). Her allegations closely track those in *Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681 (N.D. Tex. 2014), cited by Defendants, in which a medical student alleged a class-of-one claim on the basis that he was "retaliated against, harassed, disciplined against, intimidated, and dismissed from the medical school, all against his will, and differently than those similarly situated medical students whose national origin is not Indian and whose first language is not English." *Shah*, 54 F. Supp. 3d at 702; *see* (Dkt. No. 17 at ¶ 4). The district court in *Shah* observed that under Fifth Circuit precedent, "[i]f the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action—even if irrational—does not deny them equal protection," and found that the plaintiff had made only conclusory allegations that other similarly situated UT Southwestern medical students were treated differently than him. *Shah*, 54 F. Supp. 3d at 702 (quoting *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997)), 703.

In response to Defendants' contention that Plaintiff's equal protection claim is similarly conclusory, Plaintiff points to her allegations that: (1) "Defendant Garcia forced her to complete a second clinical assessment even though [Plaintiff] had already fulfilled assessment requirements for the term and no other students were required to perform a second physical assessment"; and (2) "Defendants completely failed to provide reasonable accommodations to [Plaintiff] for her medically documented disability even though prior accommodations were granted to her through the same student services lab without problems before STC began targeting [her]." (Dkt. No. 25 at § C; *see* Dkt. No. 17 at ¶ 4). Plaintiff contends that "[e]ven if another student at the school faced these situations, … no other student was retaliated against in a manner such as this," and that "she was indeed uniquely singled out and treated worse than

other students after STC began targeting her." (Dkt. No. 25 at § C).

To concede the possibility that another student may have "faced these situations," and to claim that the *degree* of the retaliation constitutes the differential treatment, does not plausibly allege a distinction between two or more relevant groups. Also, to the extent Plaintiff claims that the selective treatment consists of the decision to deny her reasonable accommodations, the only distinction she has made is between the treatment of her before and after she became a "target"; she has not alleged that Defendants granted reasonable accommodations to all other similarly situated students, but not to her. With respect to Defendant Garcia's alleged selective treatment of Plaintiff, Defendants' reply "respectfully submit[s] that a single event of a professor…administering an additional assessment procedure in a nursing program would not rise to the level of a constitutional violation." (Dkt. No. 27 at ¶ 6). The Court would tend to agree, but at this stage, need only observe that precedent does not clearly identify Garcia's treatment of Plaintiff as a viable basis for a class-of-one claim. *Id.*

In holding that the class-of-one theory recognized in *Olech* does not extend to the public employment context, the U.S. Supreme Court in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008), explained that "[w]hat seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Enquist*, 553 U.S. at 602. For example, the plaintiff in *Olech* alleged that the village zoning board consistently required only a 15-foot easement, but subjected her to a 33-foot easement, and "[t]here was no indication that the zoning board was exercising discretionary authority based on subjective, individualized determinations…with regard to easement length." *Id.* at 602-03. "This differential treatment raised a concern of arbitrary classification, and [the Court] therefore required that the State provide a rational basis for it." *Id.*

at 603.  The Court reasoned, however, that

> [t]here are some forms of state action…which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.*  Put another way, "[i]t is no proper challenge to what *in its nature* is a subjective, individualized decision that it was subjective and individualized."  *Id.* at 604 (emphasis added). The Supreme Court found this principle to apply most clearly in the employment context, where decisions "are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify."  *Id.*  The principle could also be said to extend to the context of academic decisionmaking, which in its nature is similarly discretionary.  At the very least, *Olech* and its progeny do not so clearly encompass Defendant Garcia's alleged selective treatment of Plaintiff (however irrational) as a basis for a class-of-one claim, to the extent that any reasonable official in Garcia' shoes would have known that he was violating Plaintiff's right to equal protection.  For all of these reasons, qualified immunity must be extended to Defendants on the equal protection claims against them.

**4.      Claims against STC**

**a.      Municipal Liability**

STC moves for dismissal of all of the § 1983 claims against it on the grounds that Plaintiff has failed to plead facts to support a showing of "municipal" liability.  (Dkt. No. 16 at ¶¶ 1, 2; Dkt. No. 26 at ¶¶ 1, 2).  It is well-established that a municipality or other local governmental entity, such as STC, cannot be held liable under § 1983 on a respondeat superior theory.  *E.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (quoting

*Monell*, 436 U.S. at 691); *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). "Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing cases). To establish municipal liability under § 1983, a plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle*, 613 F.3d at 541-42 (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)). Actual or constructive knowledge of the policy must be attributable to the governing body of the municipality or to an official to whom that body has delegated policymaking authority. *Id.* at 542 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)). "Whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law." *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986)); *see Fennell*, 804 F.3d at 413 (policymaker must have final policymaking authority). A municipality may be liable if the official policy itself is unconstitutional, or if the policy was adopted or maintained by the policymaker "with deliberate indifference as to its known or obvious consequences[.]" *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)) (internal quotations omitted).

b.     **Plaintiff Has Failed to Identify Policymaker Charged with Actual or Constructive Knowledge of Alleged Policy at Issue**

STC's Motion argues that Plaintiff "has failed to assert facts that even if taken as true would show that [STC's] policymakers actually or constructively knew of some alleged official policy or custom that deprived Plaintiff of her constitutional rights and served as a moving force

behind a constitutional violation." (Dkt. No. 16 at ¶ 2). Drawing from her more generalized, pleaded allegations, Plaintiff's response characterizes the official policy at issue in this case as a custom, adopted with deliberate indifference, of ignoring Plaintiff's complaints "up the chain of command" and retaliating against her. (Dkt. No. 24 at § A; *see* Dkt. No. 6 at ¶ 128-37). Plaintiff alleges that "this custom was approved by STC employees Garcia, Martinez, Saenz, and Delgado acting as final policymakers because they had final authority in their discriminatory actions that negatively affected [Plaintiff]." *Id.* She also describes the STC vice-president, Texas Board of Nursing, and Texas Education Association as "additional final policymakers who were informed of [Plaintiff's] situation yet failed to perform their obligations to protect her rights and instead sanctioned the offending de facto policy of retaliating against students for speaking up." *Id.* According to Plaintiff, "the custom and policy of indifference and of sanctioning abhorrent behavior was the 'moving force' behind the violation of [Plaintiff's] rights" under the First and Fourteenth Amendments. *Id.*

STC counters Plaintiff's identification of the alleged policymakers—the Defendant professors, tutoring center manager, and counselor, as well as the non-party STC vice-president and outside entities—with the district court's observation in *Richmond*, *supra*, that "[i]n a Texas community college, the board of trustees is the final decision maker." (Dkt. No. 26 at ¶ 1); *Richmond*, 883 F. Supp. 2d at 712 (citing *Bolton*, 185 S.W.3d at 872). STC cites to § 130.082 of the Texas Education Code as the statutory authority for this position, and in fact, the Fifth Circuit has interpreted this section as establishing a Texas community college's board of trustees as the college's *policymaker* for purposes of establishing municipal liability under § 1983. (Dkt. No. 26 at ¶ 1); TEX. EDUC. CODE § 130.082; *Coffman v. Alvin Cmty. Coll.*, 642 F. App'x 472, 476 (5th Cir. 2016). Although Plaintiff identifies Garcia, Martinez, Saenz, and Delgado as policymakers

"because they had final authority in their discriminatory actions," the Fifth Circuit "has long distinguished between final decisionmaking authority and final policymaking authority." *Valle*, 613 F.3d at 542 (citing cases). Even an official "whose discretionary decisions on a particular matter are final and unreviewable…is constrained if another entity has ultimate power to guide that discretion, at least prescriptively, whether or not that power is exercised." *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 382 (5th Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1247 (5th Cir. 1993)) (internal footnote omitted). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action" at issue. *Valle*, 613 F.3d at 542 (quoting *Pembaur*, 475 U.S. at 481-83). Plaintiff has not alleged that the identified policy—a custom of ignoring student complaints and responding to them in retaliation—is attributable to STC's board of trustees, nor has she alleged that STC delegated its authority to set final policy regarding the treatment of student complaints to its individual professors, tutoring center manager, counselor, or vice-president, much less to two outside entities. The Court agrees with Defendants that insufficient allegations exist to support the second prong of the test for municipal liability, and therefore Plaintiff's § 1983 claims against STC must be dismissed.

5. **Request for Exemplary Damages**

With respect to the only § 1983 claim remaining—against the individual Defendants, with the exception of Reed, for First Amendment retaliation—the Court turns to Defendants' argument that Plaintiff's request for exemplary damages against them be dismissed. (Dkt. No. 17 at ¶ 14). The parties agree that "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages" against individual defendants in a § 1983 case. *Wells*

*v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 259 (5th Cir. 1984) (quoting *Smith v. Wade*, 461 U.S. 30, 51 (1983)); *id.*; (Dkt. No. 25 at § H). Defendants assert that Plaintiff has failed to identify conduct that meets this standard, to which Plaintiff responds that Garcia's actions in administering the extra assessment and then failing Plaintiff "on a wardrobe technicality," and multiple Defendants' filings of baseless complaints against her, demonstrate a reckless disregard for Plaintiff's rights and intentional violations of federal law. (Dkt. No. 17 at ¶ 14; Dkt. No. 25 at § H). For the reasons explained *supra*, Plaintiff has sufficiently alleged that her speech at the ADN student conference and to the media was protected by the First Amendment, and the Court also finds that her pleading makes plausible the claim that this speech either motivated or substantially motivated Defendants' actions against her. *See Culbertson*, 790 F.3d at 617-18 (setting forth elements of First Amendment retaliation claims involving both public employee and ordinary citizen). Assuming that Plaintiff can meet the other elements of her First Amendment claim—elements which Defendants do not contest—at the very least Plaintiff has made a plausible claim that Defendants acted with reckless disregard for Plaintiff's right to be free from retaliation for her protected speech. *See id.* In short, Defendants' Motion is not the appropriate vehicle for precluding Plaintiff's request for exemplary damages.

## C. Cause of Action against Individual Defendants for Intentional Infliction of Emotional Distress

With respect to the single cause of action brought only against the individual Defendants—intentional infliction of emotional distress—the parties agree that Plaintiff must show that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). "Extreme and outrageous conduct is conduct 'so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)) (some internal quotations omitted). Defendants claim that their pleaded conduct does not rise to this level, whereas Plaintiff alleges that it does because Defendants "abused their power dynamic over [Plaintiff], the misconduct persisted over a substantial period of time, and Defendants were fully aware of [Plaintiff]'s prior harassment and delicate emotional state." (Dkt. No. 17 at ¶¶ 10-12; Dkt. No. 25 at § F). The heightened standard for a claim for intentional infliction of emotional distress comports with the purpose of this judicially-created tort: to serve as a "gap-filler" allowing recovery "in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Zeltwanger*, 144 S.W.3d at 447. Here, where Defendants' challenged conduct has a potential remedy in Plaintiff's RA, ADA, and § 1983 First Amendment claims, the Court agrees with Defendants that this standard has not been met. *See id.* at 448 ("If the gravamen of a plaintiff's complaint is the type of wrong that [a] statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether…she succeeds on, or even makes, a statutory claim.").

D.     **Plaintiff's Request for Leave to Amend**

Although Plaintiff's responses to the Motions contain a global request for leave to amend should the Court find any of her causes of action insufficient, the Court cannot discern any basis for an amendment that would bring the claims subject to dismissal within the realm of plausibility. (Dkt. Nos. 24, 25 at § V); *see Jones*, 427 F.3d at 994 (court may consider futility of amendment in determining whether to grant leave to amend). Therefore, the Court will deny this request.

V.   **Conclusion**

For the foregoing reasons, the Court hereby **ORDERS** that STC's Motion to Dismiss is **GRANTED in part** and **DENIED in part**, as follows:

- STC's Motion is **GRANTED** with respect to Plaintiff's causes of action for retaliation under the RA and ADA, breach of contract, negligent hiring, training, and supervision, and under § 1983; and

- STC's Motion is **DENIED** with respect Plaintiff's causes of action for failure to accommodate under the RA and ADA.

The Court further **ORDERS** that the individual Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**, as follows:

- The individual Defendants' Motion is **GRANTED** with respect to Plaintiff's causes of action against all Defendants in their official capacities, against Defendant Reed under § 1983 for First Amendment retaliation, against all Defendants under § 1983 for violations of Plaintiff's Fourteenth Amendment rights to substantive due process and equal protection, and against all Defendants for intentional infliction of emotional distress; and

- The individual Defendants' Motion is **DENIED** with respect to Plaintiff's causes of action and request for exemplary damages against Defendants Martinez, Garcia, Candelaria, Delgado, and Saenz under § 1983 for First Amendment retaliation.

SO ORDERED this 29th day of August, 2017, at McAllen, Texas.

Randy Crane
United States District Judge